

U.S. Department of Justice

United States Attorney
Eastern District of New York

CMM:AT/JRS
F. #2022R01048

610 Federal Plaza
Central Islip, New York 11722

January 22, 2025

<u>By ECF and E-mail</u>

The Honorable Gary R. Brown
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:   <u>United States v. Keith Williams, et al.</u>
            <u>Docket No. 25-CR-20 (GRB)</u>

Dear Judge Brown:

      The government respectfully submits this letter in support of its motion that the Court impose appropriate conditions of release to reasonably assure that defendant Keith Williams appears in court as required as well as to ensure the safety of other persons and the community.

      Williams, along with six co-defendants, has been charged in the above-captioned 56-count indictment. He is scheduled to make his initial appearance before Your Honor later this afternoon. As described in the indictment, Williams and his co-defendants attempted to steal over $650 million in COVID-19-related funds from the United States government to which they were not lawfully entitled. Williams was the mastermind of this fraudulent scheme, and he guided his co-defendants in taking advantage of a global health crisis to line their pockets. The defendants successfully obtained over $44 million through their greed, which they used to fund lifestyles of luxury that they openly flaunted through social media posts and by purchasing designer goods. All the while, the families and small businesses for whom these government funds were actually intended struggled to stay afloat amid an unprecedented worldwide pandemic.

      As set forth below, given Williams's sophisticated and years-long acts of deception, the severe potential penalties he faces upon conviction, and the overwhelming evidence of his guilt, the government respectfully submits that Williams should be released only upon the imposition and satisfaction of appropriate conditions to ensure that he does not flee or commit any additional crimes. Specifically, Williams should be subject to strict conditions of release, including the imposition of a fully secured $5 million bond co-signed by multiple financially responsible sureties.

I.    Background[1]

From in or about and between November 2021 through June 2023, the defendants, Keith Williams, Janine "Holiday" Davis, Morais Dicks, James "Poppa J" Hames, Jr., Jamari "Mr. Chaketah" Lewis, Ewendra "Rayda" Mathurin, and Tiffany "Joy" Williams (the "Defendants") conspired to obtain, by fraud, more than $650 million from the United States by preparing and filing over 8,000 quarterly payroll tax returns, known as Forms 941. On these Forms 941, the Defendants falsely claimed that they were entitled to the Employee Retention Credit ("ERC")[2] and Sick and Family Leave Credit ("SFLC," and together with the ERC referred to hereinafter as the "COVID-Related Tax Credits").[3] Many of the Defendants, including Williams, have also been charged with wire fraud for filing fraudulent Paycheck Protection Program ("PPP") loan applications prior to the COVID-Related Tax Credits scheme. Their fraudulent PPP applications falsely represented income, expenses, and wages. During the COVID-19 global pandemic, Congress enacted these programs to ensure that small businesses could remain in operation and continue to pay their employees, and families would not be financially penalized should they become unable to work due to sickness.

The Defendants' fraudulent scheme, which was headquartered at Williams's Franklin Square, New York-based business, Credit Reset, ultimately secured more than $44 million in government payments for the Defendants and their clients. According to multiple individuals interviewed as part of the investigation, Williams led the conspiracy and taught his co-defendants how to commit the fraud. The Defendants profited from the scheme in several ways. In certain cases, they received refunds by filing false Forms 941 on behalf of businesses in the Defendants' own names. In other circumstances, they charged clients up-front fees for preparing false Forms 941 claiming COVID-Related Tax Credits, and then charged clients a percentage of the refunds the clients ultimately received. Many of the Forms 941 prepared by the Defendants and their co-conspirators during the scheme were for businesses that did not actually exist or had no actual operations. In total, the Defendants sought to steal over $650 million in COVID-Related Tax Credits, and their criminal conduct appears to be the largest charged ERC scheme in the United States.

---

[1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial. The government is entitled to proceed by proffer in a detention hearing. United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004); United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).

[2] Congress created the ERC to incentivize businesses economically hurt by the COVID-19 pandemic to continue paying employees. From Q2 2020 through the end of the year, it provided for a 50% credit on up to $10,000 in wages paid to each employee for the calendar year for businesses ordered closed by government order or who had a 50% drop in gross receipts due to the pandemic. For 2021, the percentage credit increased to 70% per employee per quarter.

[3] The SFLC was passed by Congress and provided a dollar-for-dollar tax credit to businesses who paid wages to employees on sick leave and a two-thirds credit on wages paid to employees on family leave due to COVID-19.

The Defendants flaunted their criminal activity openly. Williams, who personally received millions of dollars in payments deposited into his bank accounts during the conspiracy, gloated about how he had successfully pillaged government funds that were intended for vulnerable pandemic victims. In a recorded call with a co-conspirator reviewed as part of the investigation, Williams compared the fraud scheme to "taking candy from a baby."

When investigators executed a search warrant at Williams's home, they seized millions of dollars' worth of luxury goods that appear to have been purchased using proceeds of the fraud scheme, including designer items from Rolex, Gucci, Louis Vuitton, Fendi, Balenciaga, and Versace, as well as several high-end vehicles, such as a Land Rover, a Polaris Slingshot, and a Tesla Model Y.

For his part, defendant Jamari Lewis, an aspiring rapper who uses the stage name "Mr. Chaketah," posted on social media a recording of a song he wrote entitled, "I'm Really Sophisticated (IRS)." In addition to referencing the IRS in his song title, Lewis also featured the logo for the IRS in the song's album cover:



In a music video for the song, Lewis can be seen wearing designer clothing and openly flaunting how he stole money from the IRS. Among his lyrics are: "That government bread I ran that shit up like how am I gon' lose?"

3

II.      Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." Id. "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

Abuhamra, 389 F.3d at 320 n.7.

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

4

III.     Argument

Williams presents a flight risk due to, among other reasons, the seriousness of the offense, the severity of the penalties that he faces, and the strength of the evidence.

First, "[t]he prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022). Here, if Williams is convicted at trial, he faces the possibility of serving several decades of potential imprisonment under the applicable United States Sentencing Guidelines given the intended loss amount of his fraudulent scheme. Courts have recognized that even a significantly shorter potential sentence can warrant a risk-of-flight finding. See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee").

Second, where, as here, the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." Zhang, 55 F.4th at 151; United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). Here, the evidence of Williams's guilt is overwhelming. At trial, the government will introduce evidence that the accounts that filed the fraudulent returns were owned and controlled by the Defendants, including Williams. Williams also paid for some of these accounts using his own credit cards. The government will introduce testimony from many individuals, including clients and co-conspirators, who will explain that Williams was the leader of the conspiracy, taught others how to file false returns, and was the central beneficiary of the conspiracy. Furthermore, numerous documents, communications, and recordings uncovered over the course of the investigation corroborate the expected testimony of these witnesses and will further elaborate the extent of the scheme and Williams's central role in it.

Third, Williams has the means to flee if he chooses to do so. See Sabhnani, 493 F.3d at 76 ("a second factor strengthens the case for detention: defendants' ample means to finance flight"). Based on the investigation, the government understands that Williams has substantial assets, and he personally stole several millions of dollars from the government as part of the scheme. See United States v. Zarrab, No. 15-CR-867 (RMB), 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (citing defendant's "significant wealth and his substantial resources" as another factor that supported detention). Records obtained by the government also reflect international travel by Williams to locations where he may flee from justice, including, among other places, the United Arab Emirates. In fact, one and a half months after the search warrant was executed at his

residence, Williams spent one week in Dubai. Furthermore, in order for the scheme to succeed, Williams and his co-conspirators impersonated others and manufactured fake government filings. As the Second Circuit has explained, "'apparent access to false documents' supports a finding that a defendant poses a risk of flight." United States v. Baig, 536 F. App'x 91, 93 (2d Cir. 2013) (quoting United States v. El-Hage, 213 F.3d 74, 80 (2d Cir. 2000)). Because the defendant has demonstrated his ready ability to impersonate other people and entities, his risk of flight is high, further warranting the imposition of a significant bail package. See United States v. Sternquist, No. 22-MJ-1005(RLM), 2022 WL 6162532, at *2 (E.D.N.Y. Oct. 8, 2022) ("For obvious reasons, this access to false identification devices increases the defendant's capacity for flight.").

Finally, the dishonesty shown by Williams in this case—through his perpetuation of the fraud scheme and his attempts to hide evidence—demonstrates that he cannot be trusted to return to court as required without appropriate conditions. Williams and his co-defendants took concerted steps to conceal their criminal activity, including by using Virtual Private Networks to hide the IP addresses they used to further the scheme and to avoid detection of their true identities. They also shredded documentary evidence, created fictitious records, and impersonated individuals, including clients of the scheme. Given this criminal conduct, there is no reason to believe that any promise to return to court should be accepted unless it is based on substantially more than Williams's word.

In light of the above, the government submits that the Court should release Williams only if he satisfies appropriate conditions, including a substantial, fully secured bond of $5 million co-signed by multiple financially responsible sureties with net worths of sufficient unencumbered value to pay the amount of the bond, with appropriate moral suasion over Williams. See Sabhnani, 493 F.3d at 77 ("[T]he deterrent effect of a bond is necessarily a function of the totality of a defendant's assets."); United States v. Batista, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) ("In addition to the requirement of financial responsibility, a defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial."); see also 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that any surety "have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"). Further, travel restrictions limiting Williams's travel to the Eastern District of New York should be imposed. See 18 U.S.C. § 3142(c)(1)(B)(iv). Finally, Williams should be forbidden from contacting his co-defendants and co-conspirators except in the presence of his counsel, or any witnesses (with case-by-case exclusions for family members and close friends who were not involved in the fraudulent scheme, if consented to by the government and pre-trial), see 18 U.S.C. § 3142(c)(1)(B)(v).

IV.    Conclusion

For the reasons set forth above, the government respectfully submits that the Court should impose appropriate conditions to mitigate the risk that Williams will flee or engage in further criminal activity harmful to the community.

Respectfully submitted,

JOHN J. DURHAM
United States Attorney

By:     /s/
Adam R. Toporovsky
James R. Simmons
Assistant U.S. Attorneys
(631) 715-7846
(718) 254-7511

cc:    Clerk of the Court (GRB) (by ECF)
       Counsel of Record (by ECF)